This is Bankier Apartments v. Patel. That's case number 4-10-0353 for the appellant. We have Scott Dempsey for the appealee, Rick Iles. Mr. Dempsey. May it please the court, counsel. This case involves the interpretation of a commercial lease and a subsequent addendum to that lease. And the facts of the case really relate to both of the bases for which the trial court determined that there was a basis for an eviction of the defendant as well as a basis for the monetary damages that are owed. Essentially, the addendum was entered into after the initial lease. The initial lease was from December 21st of 2004. July of 2007, the landlord came to the tenant and said, we want to renovate, build new premises here. We want you to vacate the property. It entered into a lease addendum and provided that the property would be made available back to the commercial tenant being in January of 2007. That didn't occur and it was about September of 2008 that the construction was completed to the plaintiff's satisfaction. They turned the keys back to the commercial tenant and said, take possession. Began paying rent as of October 1st, 2008. The tenants went, looked at the property and found that the work was not done. Both of the bases that the trial court found for entry and order eviction in this case and assessing monetary damages against the tenant are related to the condition of the property after the tenant came back in October of 2008 and decided the property was not to their satisfaction. The lease addendum provided that the landlord was going to restore the restaurant space, at least by the tenants, to as close to the current floor plan as possible for building code requirements, replace ceiling tiles, lighting, HVAC equipment and make any necessary electrical, plumbing, wall and floor repairs. The trial court determined that regardless of what the condition of the property was when it was tendered back to the tenants, that this was a commercial lease and that as such the tenants had an independent obligation to pay rent for this property regardless of what the condition was. And the tenants had a couple of options. They were to take possession, they could have made the repairs themselves, or the alternative, they could have continued to pay rent for the property and then sued the landlord to compel the landlord to make repairs or comply with the lease addendum. The commercial tenant did neither. They didn't pay rent and the eviction proceedings began shortly thereafter after a 10-day notice was served on the tenant to vacate the property. And the court found, again, that there was an independent obligation on the part of this tenant to pay rent regardless of whether or not the condition of the property met their needs or not. However, I believe that the court made an error of law in applying that rule because another corollary to that law is that if the tenant is not in possession of the property due to a constructive eviction or some event that... Did you order constructive eviction to the trial court? Pardon me? Did you argue constructive eviction to the trial court? I believe that it was at the final argument that was in fact argued that this was something that interfered with the oral argument and the judge then ordered the parties to submit written briefs because the court was concerned about which party committed the first material breach and the trial court ordered the parties to brief that issue under the analysis used by Section 241 of the Restatement of Contracts. So that was the issue is were the tenants in possession of the property? If the tenants were not in possession of the property due to an issue with the property that interfered with their reasonable use of the property, then they should have been excused from paying rent. Clearly, they were not in possession of the property and the trial court, in its memorandum order and opinion, concluded as an issue of fact that the tenants did not take possession of the property. They had the keys, but they never took physical possession of the property. In fact, as soon as the property was handed back to them, the tenants went in and they took a videotape of the condition of the property that was as of October 4, 2008. I believe that was something that was supplemented to the record after that and other exhibits were located in this case. Counsel, back to my question. In Mr. Ryle's brief on page 10, he states in the case of Bar the Record, it is clear that the defendants failed to raise constructive eviction as an affirmative defense. Is that incorrect? Well, it was not raised as a written affirmative defense. During the course of the trial, the judge ruled that this was in the nature of a small claims case because of the amount of money that was being sought and that, therefore, there was no need to plead it as an affirmative defense. So to the extent that they're alleging that it was not pled as an affirmative defense, that's an issue the trial court ruled on, determined that this was in the nature of a small claims case and as such no written pleading or other response was required to raise that as an affirmative defense and allow that affirmative defense. So the trial court ruled that you didn't need to plead constructive eviction as an affirmative defense? Correct. And I believe it was in fact argued that the condition of the property was such that the tenant's reasonable expectations were not met. And I think you have to weigh this agreement and analyze it in context of what the condition of the property was when the tenants agreed to vacate the property and tender it to the bank here. At that time, the tenants had an operating restaurant. They had all of the valid permits from the Champaign-Urbana Public Health District to operate a restaurant. And again, there's a videotape showing the condition of the restaurant as of July of 2007 when they agreed to vacate the property. When they resumed or took possession back from the plaintiffs of the property in October of 2008, the property clearly did not meet their expectations that they would be able to come back into the property within a short period of time and resume operation of a restaurant. And I think if you can analyze that in connection with the lease addendum, it talks about the electrical work being done, plumbing, walls, floors, repairs being done. I think the evidence of trial is overwhelming that those issues had not been complied with by the plaintiff when the plaintiff arbitrarily decided this work is done, this project is long past due, we're going to tender the property back to the defendants and they're going to have to just deal with the condition of the property at that time. And the evidence of the trial was from an inspector from the Champaign-Urbana Public Health District who did inspection of the property in, I believe, March of 2009, and said that this property needed a complete overhaul at this point. It was not up to code, there was no way it would pass inspection, it was not fit for operation of a restaurant, the inspector found multiple plumbing leaks, electrical problems, damaged walls, missing floor tiles, all something that the plaintiff agreed to do under the lease addendum. So the reasonable commercial expectation of the defendants was that maybe we're not going to be able to start operation of the restaurant within a day or two after the property is returned to us, but within a reasonable time we expect that the property is going to be returned in substantially the same condition as when we vacated the property and that the plaintiff is going to do what it agreed to do under the terms of this lease addendum. And they decided not to take possession of the property due to the defects in the property. And the plaintiff would have you believe that these were just minor issues where you could simply mop up the floor, put some knobs on some stoves that were missing, make some minor repairs, but that was simply not the case. And the evidence at trial from the plaintiff was that the plaintiff, after they tenured the property to the defendant in October of 2008, that they had to spend an additional $5,000 to make all the repairs to the Champaign-Urbana Public Health District that had to be made in order for the defendant to get an operating permit to operate a restaurant at this property. So these were not minor repairs, especially given the fact that the defendant had been out of the restaurant business for much longer than had been expected. The lease addendum called for the defendants to take possession of the property again in January of 2008 or when work was completed. And we're talking about October of 2008, more than ten months after the repairs were originally supposed to be done. So essentially the trial court passed the burden on to the defendants to say, okay, you're going to need an additional $5,000 to make this property fit for operation of a restaurant, to bring it up to the same condition it was in when you vacated the property in July of 2007, and we're going to put that burden on the defendant rather than make the plaintiff comply with the terms of the lease addendum and do what it agreed to do in that lease addendum with respect to electrical repairs, plumbing repairs, floor and ceiling wall repairs and things such as that. So the court determined that regardless of the fact that the defendants did not take possession of the property, that they still had an independent obligation to pay the rent. And the court did not then get into an analysis about whether or not this essentially amounted to a constructive eviction where the property was in a condition to deprive the defendants of their beneficial use of the property as a restaurant. And that's where I think the trial court erred in that they did not take that additional step. The trial court determined that regardless of what the condition of the property was, that the defendants had an independent obligation to pay rent and did not then analyze whether or not the defendants essentially were not able to operate the restaurant, were not able to do what they had been done before because they were being deprived of the beneficial use of this property due to the defective condition of the property. So the trial court erred, I believe, as a matter of law in determining that that was the end of the analysis on whether or not the defendants had an obligation to continue to pay rent when the property was tendered back to them in 2008. The court then used an alternate analysis and said that even if it was the case where the defendants did not have And the court essentially analyzed whether or not the plaintiff tendering the property back to the defendants in October of 2008 breached the lease addendum to the extent that that was a material breach versus non-payment of rent. So which party committed the first material breach? And the court determined that the defendants committed the first material breach by not paying rent. Again, I believe the court applied erroneous reasoning in reaching that conclusion. I think, first off, the court didn't even need to reach the issue of analyzing this under Section 241 of the Restatement of Contracts because I think the evidence at trial is overwhelming that the plaintiff did not comply with the lease addendum and that there were multiple electrical, plumbing, floor, wall defects. The property was simply not suitable for operation of a restaurant. Again, I believe the correct analysis is what were the parties' reasonable expectations upon receiving the property back? And I think based on the fact that the defendants had an operating restaurant, they complied with all of the Champaign-Urbana Public Health Code requirements in July of 2007 when they agreed to deliver the property to the plaintiffs for their renovations and repairs. The commercial expectation of the defendants was certainly that when they get the property back, that they can move their restaurant equipment in, and within a certain reasonable time period, a matter of a few days, a week, or whatever, they'd be able to be up and running again with respect to a restaurant. I don't think the reasonable commercial expectation of these parties was that the property would be delivered back to the defendants and that there would be substantial defects that required more than $5,000 to repair those defects and get the property up to code, that there would be plumbing leaks, that there would be electrical defects, that walls and floors would not be repaired. This all goes back to the fact that the plaintiff was allowed to essentially arbitrarily choose that this project was done. We're going to give the property back to the defendants regardless of what the condition of the property was, and it's going to be their problem. They're going to have to deal with this, and they're going to have to make the repairs, and we want to start paying rent regardless of what the condition of the property was. The defendants have claimed that they didn't have any notice of these defects. However, Mary Booth, one of the limited partners in the plaintiff, testified that she was the general contractor for the renovations to this particular unit. She was aware of the condition of the property when it was tendered back to the defendants. She had been in the property within a matter of days before it was tendered back to the defendants, so they can't argue that this is a situation that often occurs in a constructive eviction case where the landlord doesn't know about these alleged defects. In the typical constructive eviction case, you have a tenant already in possession of the property, and it is the tenant's obligation at that point to notify the landlord that there are these issues with respect to the property that we are asking the landlord to repair. Without that, the landlord has no way of knowing, since the tenant is in possession of the property, what the issues are, what needs to be repaired, and what the landlord needs to do in order to allow the tenant to operate their business. This is a different situation because up to the point where the renovations were allegedly completed, the plaintiff was in possession of the property. The landlord had possession of the property, they knew of the condition of the property, and despite that, they then tendered the property back to the defendants for them to resume the operation of a restaurant. The plaintiff argues in his brief that the evidence at trial did not support the conclusion that the landlord was advised of these problems. But again, I think the evidence was contradictory at the trial about whether or not the plaintiff had notice of these alleged defects, but they were in possession of the property up to the point where they mailed the key back to the defendants and said, take possession of the property. One of the principals in the plaintiff was also the general contractor on this job and was responsible for making all the renovations and repairs, so the plaintiff obviously knew what the condition of the property was when it was returned to them. With respect to who committed the first material breach, I don't think the trial court even needed to analyze this under Section 241, because I think the evidence, again, from the inspector from the Champaign-Urbana Public Health District and the defendant's expert witness both concluded that the plaintiff had not complied with this agreement. The court went on to say that because of the length of time that this property had been vacant and no rent had been paid, that the defendant committed the first material breach by not paying rent. However, I think the court erred in its analysis by taking into account everything that had occurred since the filing of the eviction complaint in November of 2008. By November of 2008, the eviction complaint was filed and the defendant was already alleging a breach on the part of the defendants. I think the correct analysis is to determine as of the time that the eviction complaint was filed, who had committed the first material breach of the lease or the lease addendum. Essentially, the plaintiff benefited by the fact that this case went on for a considerable length of time after the eviction case was filed and the parties were at an impasse, no rent was being paid, and the parties could not agree upon who was going to have possession of the property or how much money was owed. This case went to trial. It was a rather lengthy, protracted trial that lasted several months. However, in the end, the court determined that because of the length of time that had passed and the fact that no rent had been paid during this time period, that essentially the plaintiff would suffer a forfeiture if there was not an order of eviction entered. And because of the forfeiture suffered by the plaintiffs, that in part weighed in favor of the determination that the defendant has committed the first material breach. But I think the correct analysis is, as of October 1st, 2008, when the property was tendered back to the defendants, who was in breach of the lease at that time, in the lease addendum? Was the plaintiff in breach of the lease because it did not return the property to the defendants in the condition that complied with the lease addendum? Were they in breach because they didn't provide the defendants with a property that was suitable for operation of a restaurant within a short period of time after that? If that was the case, then that's a material breach. The commercial expectations of the defendants were that, again, we get the property back in October of 2008 or whenever the repairs are done, and within a short period of time after that, we should be able to be up and running and operating a restaurant. So the first material breach was committed by the plaintiff when they tendered the property back to the defendants in a condition that clearly did not comply with the terms of the lease addendum because of the multiple defects. That excused the defendants from payment of rent at that point, and I think that's the correct analysis rather than having the court determine that because we've had this case pending for more than a year and there's been no rent that's being paid and the property has been vacant, that the condition of the property was not a material breach as of October of 2008. Instead, the plaintiff would suffer much more of a forfeiture by not being able to recover rent for that time period. So I think the court erred again in determining what had occurred since the filing of the eviction complaint, and I think the correct analysis is to determine as of October of 2008 who committed the first material breach, and had there been a breach by the defendants as of the time that the plaintiff filed this eviction complaint in November of 2008 by not paying rent. If the property was simply not suitable for operation of a restaurant in October of 2008 and the defendants did not take possession of the property, they should have been excused from paying rent and the plaintiff committed the first material breach of the lease. I'll reserve the rest of my time for rebuttal. Thank you, Mr. Dempsey. Mr. Riles. Thank you. May it please the court, counsel. I'm here on behalf of the landlord simply requesting that the lower court's decision be upheld in its entirety, addressing some of the arguments made by Mr. Dempsey. The lower court in this case actually found that the defendants were in possession. If you look at the first page of the Memorandum of Opinion and Order, the bottom of the first paragraph, the court says, defendants have long persisted in at once retaining possession of the premises while not using it for restaurant purposes. So there was a finding of the court that they were in possession. I believe that finding is well in accordance with the facts and the evidence that produced a trial, and based on the decision in McCardle cited in my brief, the lower court correctly held that the defendants could not, on the one hand, retain possession, and on the other hand, not pay rent. They simply can't do it in a commercial lease context. It's beyond dispute that they were in possession, even though they steadfastly denied it. The landlord, after the work was completed, sent the keys to the tenant. That's how the landlord gives possession of the space to the tenant, through the keys. The tenants don't deny that they received the keys. They signed a certified mailing receipt that they received the keys. They admitted receiving the keys. They admitted coming up and looking at the property within a very short time after receiving the keys. Do you disagree with the appellant's description of the state of the property when they got the keys and looked at it for the first time? Well, I do disagree. I think on the one hand, when you look at the videotape that they were showing at trial, as I was sitting there watching the tape and at the same time listening to the testimony of the witness, I thought I was looking at two different things. I thought what I saw on the tape wasn't nearly as outrageous as what they were saying. There were some minor issues. There was some dust. There were complaints of a grease trap being full. There were complaints of missing knobs. And, of course, those things were evident. How about mold in the cooler? Well, my client testified. I don't know that we disputed that there was mold, but my client testified she never saw the cooler. It's a big walk-in freezer. It's kind of in a wall. She never saw it. She never went in it before they vacated. She doesn't know what the condition was then, and she never went in it when they came back. It just stayed there. She didn't even know how to turn it on. It was their cooler. It's their property. So the cooler is there. Whatever the condition was inside, it was. But my client didn't do anything to it. But that aside, if we jump past the issue of possession and address were these alleged defects a breach, I think the court was correct in finding that they were not. And I think the very first reason that they weren't is the landlord had no notice. The landlord cannot be in breach of the lease unless the tenant is alleging, hey, there's a problem, and you have to correct it. And the lease gives the landlord a period of time to do that. The landlord had absolutely no notice. Now, Mr. Dempsey says, well, the landlord was the general contractor. The landlord was aware of the condition of the premises when it was returned. Well, that's true. But being aware of the condition and being aware that the tenant is claiming that something is in violation of the lease or the lease of the number of two different things, the landlord had no notice that the tenant thought that the space had anything wrong with it. There's no dispute that the first time the landlord learned that the tenant was claiming there were problems with the space was in March of 2009, six months after keys were tendered in the letter of September of 2008. That's the first time. Now, the defendant's witnesses testified, well, we made some calls. We tried to contact the landlord. My client and her agents in the office dispute that. My client did admit receiving a return phone call on her cell phone at one time after she had called wanting to know where the rent was. But there was no discussion about the reason for not paying rent. There was no suggestion that anything was wrong with the property. So my client had no notice that they were claiming anything was a problem until March of 2009, just prior to the first appearance on the eviction. And that's when she received these reports. How can the landlord be in breach of the lease for alleged defects when the landlord had no notice and was given no opportunity to repair these defects? Now, looking at the conduct of the parties, once the landlord found out in March why they allegedly weren't operating their restaurant, what did the landlord do? She proactively contacted the health inspector. Now, the addendum says nothing about health codes. The landlord, as the lower court correctly picked up on, the landlord is in the real estate business. The landlord is not in the restaurant business. The landlord did not agree to have anything up to certain health codes. The landlord isn't familiar with restaurant health codes. It's the operator of the restaurant that files the application and gets the operating permit. But despite that, the landlord proactively contacts the health inspector and says, Now, I understand there are some things you think need to be done. Now, at this point, their application hadn't been rejected. They had not been refused a permit to operate because they had never filed an application yet. They hadn't even tried. Regardless, the landlord contacts the health inspector, understands that the health inspector thinks there are some issues that need to be addressed, that some stairs in the back during the renovation are wooden and you can't have wooden stairs. Okay, we'll fix that. There's a dent in a stainless steel countertop on one of the cases that's apparently not up to health code. Okay, what did the landlord do? She spent a few thousand dollars. Actually, she spent about $5,000 to $6,000. But a large part of that expense was replacing the stainless steel tops on the two deli display cases. She did that. She had no reason to do that. In my opinion, she wasn't obligated to do it. But she did it. And why did she do it? She was just trying to get these folks to get their restaurant in operation. That would help them. That would help her. We'll deal about the background later. Just start operating. She also contacted the property inspector. Now, the property inspector testified that when he got access to the property, he was told by the tenants that they were interested in buying the property, and that's why they wanted this inspection. They also take him into the basement space of the property. Now, that's not even part of their premises. It's not even anything they lease.  They had him inspect the basement. He testified on cross-examination that certain things in his report that he listed as defects were admittedly minor, but he chose to list them as defects at the request of the tenants for whom he was doing the inspection. Despite that, my client contacts the property inspector, gets an understanding of what he thinks is wrong with the space. She, again, spent $5,000 to $6,000 to correct various things and had him come back out and basically tell her, okay, all these things are resolved. So within a very short period of time and a relatively minor expense, the landlord had addressed all of the issues that the tenants claimed were preventing them from operating the restaurant. There was a final meeting with the health inspector. I believe that was April 19th through 20th. The tenants weren't at the meeting, although the landlord's agent testified that she had expected them to be there. The health inspector told the landlord, it's all clear. All the tenant has to do, all the restaurant operator has to do is file an application, pay a small fee, and the permit will be issued. The landlord's agent testified that Anil Patel, one of the tenant's agents, came into the bank here office that afternoon or the next day, I can't recall specifically. She handed him the application, told him, you simply need to fill this out and submit your application. And your operating permit will be issued. And nothing happened. We ended up several months later going to trial. And this trial took several days. It's seven transcripts long. There was a lot of testimony about all of these problems. And the tenants are claiming these things kept us from operating the restaurant. And as Judge Leonard pointed out in the lower court, he found it frankly implausible that the defendant's agents on the one hand are stating that operating the restaurant was their primary focus and their goal and it's something they desperately wanted to do. But on the other hand, they couldn't even try and find missing knobs to put back on the stove. They didn't even investigate. When I asked some of these witnesses, how much time did you spend, you know, if you thought it was dirty, how much time did you spend cleaning it? Did you hire anybody else to clean it? Did you put a little elbow grease in to wipe the dust off the counters? Did you find knobs? Did you call the restaurant supply house? Did you know you can turn a gas knob on a stove with a pair of pliers? You don't actually need the knob. None of these things were done. And the reason they weren't done was apparently because the tenants believed that, well, it wasn't our job. It's not our job to do it. Now, Mr. Dempsey suggests that a breach occurred when the space was returned because the space wasn't returned in conformance with the terms of the addendum. But I beg to differ. This addendum merely says that the landlord was going to conduct renovation and expansion of the building. During the construction period, there would be no rent due. Upon completion of the construction, they would reoccupy. Now, the tenants testified they had no idea what renovation and expansion was. They had no idea what the landlord was planning to do with the building. None. The only person that knew what renovation and expansion was was the landlord. So it was solely in the landlord's discretion to determine when the renovation and expansion was completed. And the landlord made that determination in good faith when she tendered the keys back to the tenants. So based on these reasons, I think the lower court, again, correctly found they were in possession and correctly found that to the extent a breach was committed, it was the tenants that committed the first material breach by refusing to pay rent while at the same time remaining in possession. The lower court, when it did address the restatement second issues, just quickly I'd like to touch on those. The first issue under the restatement second analysis, the extent to which the injured party would be deprived of a benefit which he reasonably expected. Well, if the tenants are the injured party, the court found that the tenants' expectations were not reasonable. We tried to elicit testimony. I tried to elicit testimony to try to give you an idea of what were they wanting, what did they expect. I kept hearing this term, turnkey. Whatever that term meant, it didn't make it into the terms of this amendment. And claiming that these alleged problems prevented them from operating the restaurant, again, flying in the face of the evidence, which shows that once they were given the all clear by the health inspector, they still refused to do it. Second criteria, the court found that in addressing the extent to which the injured party can be adequately compensated, the court found that they easily could have been adequately compensated. They were claiming there were problems. Well, look what the landlord did. He spent a relatively small amount of money and in a relatively short amount of time addressed every issue. So they easily could have been compensated. The court found that that factor weighed heavily in favor of the landlord. The third factor, the extent to which the party failing to perform will suffer forfeiture. Again, the court found if it were to find that the landlord committed a breach and not even addressing the fact that the landlord got no notice and was given no opportunity to cure as it's allowed under the lease, but even if it found it committed the first breach, would it suffer forfeiture? And the court said, yes, it would. It spent $80,000 just to buy the time to do the renovation. It spent another $80,000 renovating the space. It spent another five to six addressing the additional issues. And then it has been without rent. At the time of trial, we were 16 months without rent since the keys and the tenants. So the court held that the landlord is definitely going to suffer a major forfeiture if I find that simply not having the property up to the tenant's astronomical expectations when the keys were returned was a breach. Addressing the fourth and fifth factors, though, and these are factors the court really didn't address, but I would like to touch on them because I think they weigh heavily in favor of my client. The likelihood that the party failing to perform or to offer to perform will cure the failure, taking into account all circumstances. The fact that the landlord, once it first received notice that the tenant wasn't happy with the space, acted promptly, proactively to contact the health inspector on her own, contact the property inspector, find out what they wanted, spent $5,000 to $6,000 to address those issues, had those people come back and given the all-clear, is the best evidence. And in fact, the landlord testified, had I known about these things in October of 2008, I would have done the same thing. We just wanted them to get the restaurant in operation. That factor clearly weighs in favor of the landlord. The final factor, the extent to which the behavior of the party failing to perform or offer to perform comports with the standards of good faith and fair dealing. I don't know how the most objective review of the evidence can indicate that the landlord conducted itself in anything other than the utmost good faith in trying to get these tenants back in this space. Spent money it didn't think it was required to spend. Instead of proceeding to trial in March immediately on tenants' assurances that we really want to operate the restaurant, decided to allow the trial to be continued, spent additional sums, got the permit delivered to them, continued to try and negotiate with them to get them in the space. That shows the landlord really wanted these folks to operate the restaurant. And then conversely, if you look at the conduct of the tenants, they always wanted more. It was always something. And the landlord gave more and gave more and tried to address their grievances and tried to address their grievances. And once the permit is ready to be issued to them so they can operate the restaurant, they still do that. I really don't know what it is they wanted, what motivated them, but they didn't want to operate a restaurant. And based on the evidence that's what the court found. And I think that was clearly in light of the overwhelming weight of the evidence that was a correct decision. Mr. Dempsey suggested that the defendants' experts concluded that the landlord had breached the addendum. That wasn't the case at all. The defendants' experts testified about what they did. The court concluded that even if the condition of the premises was a breach, it wasn't the first material breach. And again, the court concluded that in any event, due to the fact that we're dealing with a commercial lease, the tenant could not withhold rent and at the same time occupy the premises. And addressing the health inspector, the health codes weren't even a part of the addendum. What did the landlord do? Again, the landlord spent $80,000 on this space. Now, admittedly, a lot of this stuff was behind the walls. New HVAC, new ductwork, a sprinkler system, a fire retardant system, fire retardant system. In addition, it did do some things to the interior, such as replace the 2x4 drop ceiling tiles with 2x2 tiles, more expensive. Extended the front of the space by several feet, giving them more space in their restaurant, and then put new flooring down it. The landlord did replace the floor in several areas where the landlord deemed that it needed to be replaced. So this was a very... The landlord cleaned the dishes and pots and pans, had their agent go in and clean the dishes, pots and pans, put them back up on the racks, had them clean the stove and remove the grease that was on top of the stoves when she took possession of the property. And what did they find under the grease? They found rust. And then the tenant's complaining that there was rust on their stove, but the landlord had nothing to do with the rust on the stove. The landlord did all that it could. The court also, again, addressed the fact that the property, the oral agreement with respect to storage of the property, wasn't a part of this paragraph 30 of the lease. Amendments to the lease have to be in writing. And I cite it to a case indicating that only issues germane to possession are before the court in an eviction action. This agreement about property was not germane to possession. So it cannot be considered because it's outside of the four quarters of the written lease. Finally, the court correctly found that arguments of notice would not prevail. The record's clear that these tenants had more than 30 days from the time they received notice of breach of lease for failure to pay rent to the time the action was filed. So as a matter of fact and law, they received more than 30 days notice. So we ask that the court uphold the lower court's decision in this entire defense. Thank you, counsel. Rebuttal, please. The defendant certainly had the keys to the property, but I don't think that's akin to actually physically occupying the restaurant. And in fact, in the court's memorandum of opinion at page three, the court concluded that the defendants never reoccupied the premises nor paid any rent. So the court concluded that the defendants never began operating the restaurant, never actually occupied the property, even though they had the keys. And I think that's a significant difference. Because under the constructive eviction law, that line of cases basically says that you can't continue to operate your business under commercial lease and file a complaint about some minor defect that does not interfere with your operation of the business, does not substantially interfere with your enjoyment of the property, and yet withhold rent. Under those cases, the courts are saying that if it's a minor defect, the tenant has to make those repairs and then sue the landlord to recover the money or keep paying rent and sue the landlord to force the landlord to make those repairs. That's not the case when you have defects that prevent a tenant from operating their business at the space. And that's what occurred in this case. Yes, the defendants had keys. But how about the argument that the tenant did not notify the landlord? I think that, again, that's an issue of fact. The court didn't necessarily make a conclusion. I think there was testimony both ways. There was testimony from the defendants and their employees that they made The landlord said, no, I never heard from them. I didn't know anything about this until February or March of 2009. However, I think this is not the typical landlord-tenant case involving a constructive eviction where the tenant is in possession of the property, has been in possession, and the landlord simply doesn't know what the condition of the property is because they're not in possession of it. The plaintiff was in possession of this property. They made the decision, and I think it was an arbitrary and unfair decision, that we're done with our work. We're going to pass this on to the defendants and put the burden on them, even though they've been out of operation of their restaurant for ten months longer than expected, not generating any income, not receiving the benefit of additional lost money that was paid by the defendants in terms of the lease addendum. We're going to put the burden on the defendants to make any needed repairs. I believe that since this was the situation, that this would be akin to signing a new lease and a landlord turning over property to a new tenant. This is the exact same situation. I think the landlord is charged with knowing the condition of the property. In this case, especially with Ms. Booth being the general contractor for this particular project, she knew the condition of the property. And I think the condition of the property clearly did not satisfy the defense's reasonable expectations about this property. And I think the court can analyze that issue very simply. Would the defendants have been able to obtain a permit to operate from the Champaign-Urbana Public Health District like they did in July of 2007 as of October 1st of 2008? And quite simply, they couldn't, even though Ms. Michael... Did they try? They did not try because they were trying to resolve the issue with the landlord first. And that's where it was a factual issue at trial, but the tenant said we kept calling the landlord to try and get these issues resolved and it wasn't until the eviction case was filed and the inspector from the Champaign-Urbana Public Health District came out in March of 2009 that they actually got a determination from the Public Health District that the property was not suitable for operation of a restaurant. But the testimony also was that the defendants didn't do anything to the restaurant between October 1st of 2008 and February and March of 2009 when the inspector from the Public Health District inspected and their expert inspected the property. The condition was essentially the same. And so that inspection I think is conclusive on the issue that this property simply did not meet their reasonable expectations as of October 1st of 2008. And Mr. Iles says, well, the $5,000 to $6,000 that the landlord had to spend to repair this property is a relatively modest sum, but not if you are a business and unable to generate income for much longer than anticipated under the lease addendum. Yes, they were paid $80,000 for their lost income, lost profits through January of 2008. But we're talking about October of 2008 when the property was finally tendered back to them 10 months after they were supposed to take possession of the property. They've been out of business. And the issue is who is better to bear that burden, the landlord who has controlled this property or the tenant? I think the landlord was in a much better position to bear that burden. The issues in October of 2008 were much more than simply getting rid of some rust, moving some brooms. The property clearly was not fit for operation of a restaurant. And as such, I believe the court erred in entering the order of eviction and entering a monetary judgment against the defendants. And we'd ask that the trial court be reversed. Thank you, counsel. The case is submitted.